Filed 6/13/25  In re Alexander M. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re ALEXANDER M., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> ALEXANDER M., <br><br> Defendant and Appellant. | F088180 <br><br> (Super. Ct. No. 19JL-00097-D) <br><br> **OPINION** |

APPEAL from a judgment of the Superior Court of Merced County.  Mark V. Bacciarini, Judge.

William Safford, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Kimberley A. Donohue, Assistant Attorney General, Amanda D. Cary, Sean McCoy, and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

The People allege Alexander M. (appellant) and two other subjects armed themselves with knives, chased the victim through an apartment complex and stabbed him 16 times, killing him. Based on these allegations, the Merced County District Attorney's Office filed a juvenile wardship petition alleging appellant committed murder (Pen. Code, § 187, subd. (a)).

The juvenile court granted the People's motion to transfer appellant to a court of criminal jurisdiction pursuant to Welfare and Institutions Code section 707, subdivision (a)(1).[1] This appeal is taken from the transfer order. (See § 801, subd. (a).) We reject appellant's arguments that the court's findings were not supported by substantial evidence or that the court otherwise abused its discretion in ordering transfer. We affirm.

# BACKGROUND

## I.      Factual Allegations.[2]

The alleged offense occurred when appellant was approximately 17 years and nine months of age.

On December 21, 2022, at approximately 1:00 a.m., officers were dispatched to an apartment complex for a report of an active fight involving five to 10 people. Upon arrival, officers discovered Jordan Love (the victim), on the ground near a walkway behind the apartment complex. He had at total of 16 stab wounds to his chest, back, arms, and legs. He was bleeding heavily and stated he could not breathe. He subsequently died from his injuries.

---

[1]      All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]      This summary is drawn from the probation report on the behavioral patterns and social history of the appellant. (See § 707, subd. (a)(1).)

Law enforcement investigation revealed the killing was preceded by an ongoing dispute between the victim's family and the Joya-Flores family. The victim's mother and several members of the Joya-Flores family resided at the apartment complex. Appellant was in a dating relationship with a member of the Joya-Flores family. According to witnesses, the dispute originated several years before the killing when the victim's brother, Isaiah Love (Isaiah), made a disparaging comment about the daughter of Alejandro Joya-Flores (Alejandro) through text messages or social media.

Alejandro's mother told law enforcement that on the night of the killing, Alejandro came into her apartment " 'all bloody' " and stated he had been jumped by " 'the Loves.' " Alejandro, his mother, and several others then went to the victim's mother's apartment to confront her about the assault. Alejandro's mother claimed that while she was speaking to the victim's mother, the victim approached Alejandro and hit him in the head with a hammer, then fled. She claimed she did not know the victim had been stabbed.

The victim's mother and sister described a different version of events. They reported that Alejandro came to their apartment looking for Isaiah. They told Alejandro that Isaiah was not there, and he said he would wait. The victim arrived at the apartment, challenged Alejandro to a fight, struck him in the face, and left. Isaiah then came to the apartment, grabbed Alejandro by the face, and demanded to know why he was looking for him. Once Isaiah let Alejandro go, Isaiah left the area, and the victim's mother and sister went back into their apartment.

Shortly thereafter, Alejandro's mother arrived at the apartment door with several other subjects. The victim's sister stated one of the subjects was a person "by the name of Alex with long hair."[3] The subjects asked about Alejandro being assaulted by the victim and Isaiah. When the victim's sister attempted to explain what happened,

---

[3]     A member of the Joya-Flores family described appellant as having long hair.

someone from the group said, " 'We don't give a fuck, watch what the fuck happens.' " An argument ensued, and the victim's mother closed the door.

A neighbor called the victim's mother and told her the subjects outside of her apartment were exchanging knives. Law enforcement contacted the neighbor, and she confirmed she saw Alejandro outside of the victim's mother's apartment passing out knives to people around him.

The victim's mother called the victim and told him what happened, then left her apartment to go to a friend's house. Once outside, she noticed the group of subjects was still nearby, and she was confronted by two males. One of the males accused her of "hiding" her sons and punched her in the face. She then saw a group of males breaking the victim's car windows with hammers. She did not know where the victim had gone, so she searched for him in the apartment complex. When she found the victim, two people were holding his sides, and he appeared unable to breathe. The police arrived soon after.

Officers recovered surveillance footage from the apartment complex. Approximately 30 minutes before the killing, a dark colored four-door vehicle enters the parking lot. A male subject exits the car and approaches Alejandro, who was standing in the apartment complex. The subject strikes Alejandro in the face and knocks him to the ground, kicks him in the head, then gets back into the vehicle and flees. Alejandro stands up and appears to be bleeding heavily from his face and head.

After the assault, several subjects join Alejandro in the apartment complex. Approximately 30 minutes later, a dark colored four-door vehicle pulls into the parking lot.[4] The victim is in the driver's seat. Alejandro's group approaches the vehicle, and the

---

[4] The probation report does not specify whether this is the same four-door vehicle that entered the parking lot 30 minutes earlier.

victim flees on foot. Alejandro and three other males holding knives chase after the victim.

After several minutes, the group stops pursuing the victim and returns to the victim's vehicle. The victim appears to observe this and runs toward his vehicle. Before he reaches it, the vehicle suddenly reverses at a high rate of speed and exits the apartment complex. Three males from the group notice the victim is still nearby and chase after him a second time. The victim appears to be holding a weapon as he is initially chased.[5] He runs through the apartment complex but falls to the ground near a pool gate. The three males immediately begin stabbing the victim. The officer who reviewed the surveillance video counted 16 stabbing motions between the three males. After the stabbing, two of the males fled in a van, and the third walked toward an apartment building. The males were identified as appellant, Julius Joya-Flores and Jose Joya-Flores.

Several days after the killing, Isaiah provided law enforcement with a written letter describing what he perceived during the incident. He wrote that appellant "tripped the victim and stabbed him."

Law enforcement obtained a warrant for appellant's arrest. In January 2023, in an attempt to apprehend appellant, officers executed a search warrant on his sister's residence, but he was not present. In April 2023, officers placed a "pole camera" near the residence of Julius Joya-Flores and Jose Joya-Flores. Footage from the camera showed appellant entering and exiting the residence on several different days. Officers then executed a search warrant on the residence and arrested appellant.

---

[5] The report does not describe the "weapon" the victim is holding and states it is "unclear if the victim struck any of the subjects."

During a *Miranda*[6] interview, appellant claimed he had nothing to do with the victim's death. When an officer told him there was video footage of him at the scene with a large knife, appellant replied, " '[S]upposedly.' " When asked if he wanted to provide his side of the story, appellant stated, " 'I was there, but I didn't do shit.' "

## II.    Procedural History.

The Merced County District Attorney's Office filed a juvenile wardship petition under section 602, subdivision (a), alleging appellant committed murder (Pen. Code, § 187, subd. (a)) with an enhancement for the personal use of a deadly weapon (Pen. Code, § 12022, subd. (a)(1)). The People also alleged a violation of juvenile probation. (§ 777, subd. (a).) On the same date the petition was filed, the People moved to transfer appellant to a court of criminal jurisdiction under section 707.

## III.    Transfer Hearing Proceedings.

### A.    *The probation report.*

At the transfer hearing, the People submitted on the probation officer's report on the behavioral patterns and social history of appellant. (See § 707, subd. (a)(1).) The deputy probation officer who authored the report was called as a defense witness. In the report, the probation officer recommended appellant be transferred to criminal court. The recommendation was based on the five criteria set forth in section 707, subdivision (a)(3).[7] The probation officer's report and testimony are summarized below.

---

[6]    *Miranda v. Arizona* (1966) 384 US. 436.

[7]    As discussed *infra*, the juvenile court must consider the following criteria in determining a transfer motion: (1) the "degree of criminal sophistication exhibited by the minor" (§ 707, subd. (a)(3)(A)(i)); (2) "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction" (§ 707, subd. (a)(3)(B)(i)); (3) the "minor's previous delinquent history" (§ 707, subd. (a)(3)(C)(i)); (4) "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor" (§ 707, subd. (a)(3)(D)(i)); and (5) the "circumstances and gravity of the offense alleged in the petition to have been committed by the minor" (§ 707, subd. (a)(3)(E)(i)).

The probation officer concluded the instant offense showed a high level of criminal sophistication because appellant and his coparticipants armed themselves with weapons, planned to attack the victim, and executed that plan. After the killing, appellant evaded capture by law enforcement for several months. During that time, appellant failed to report to or contact probation despite being a ward of the court. The probation officer also noted that after appellant was initially placed on juvenile probation, he committed new criminal violations, violated his probation, served custody time in juvenile hall, and showed association with the Norteño gang.

With respect to the likelihood of rehabilitation, the probation officer observed appellant has been on juvenile probation since the age of 14 and offered numerous rehabilitative services, but he has made little to no effort to attend or participate. Appellant initially completed an anger management course through his school district. He was then referred to the "L.I.N.K." program for anger management and other life skills but was terminated for lack of participation and nonattendance. He was referred to the "RISE" program, which involved job training, but failed the program because he did not report to work and showed poor academic performance. Probation referred appellant to RISE a second time, but he was dropped from the program because he did not report. Appellant also participated in a substance abuse counseling program for his marijuana use, but he was dropped from the program because he "did not take the counseling provided seriously. " Based on appellant's repeated failure to follow through with the rehabilitative services offered and his continued delinquent conduct, the probation officer concluded appellant "does not seem capable or willing to be rehabilitated as juvenile."

The probation officer stated that if the allegations in the wardship petition were found true, the baseline term of confinement in a secure youth treatment facility would be seven years. He asserted that appellant would not be able to complete this baseline term because he was already 19 years old, and juvenile court jurisdiction would expire when he reached the age of 25.

The probation report also detailed appellant's delinquent history. Appellant was first adjudged a ward of the court in July 2019, based on findings of assault with force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4)) and a great bodily injury enhancement (*id*., at § 12022.7, subd. (a)). In that case, appellant confronted and assaulted the victim after school. The victim sustained head trauma and was transported to the hospital by ambulance.

Appellant was found to have violated probation in November 2019. The violation was based on several incidents, including chasing and assaulting a "homeless" woman, resisting detention by officers, and vandalizing the vehicle of a school principal. In November 2020, appellant was again found to have violated probation based on his arrest for possessing a stolen vehicle.

Addressing the success of previous attempts to rehabilitate appellant, the probation officer again highlighted appellant's repeated failure to attend and participate in rehabilitative programs. Appellant's continued delinquent conduct also demonstrated that attempts at rehabilitation were unsuccessful.

As to the gravity of the instant offense, the probation officer reasoned that appellant's conduct showed "a total disregard for human life." Appellant and his coparticipants took "justice into their own hands," handed out weapons, and executed a planned act of retaliation, ending the victim's life.

**B.**     ***Supplemental probation report.***

A different probation officer authored a supplemental report detailing appellant's behavior while incarcerated in juvenile hall on the instant offense. In July 2023, appellant assaulted another juvenile inside of a classroom. An officer deployed Oleoresin Capsicum (O.C.) spray because appellant failed to comply during the altercation. Appellant and the other juvenile were separated when additional officers arrived to assist. In August 2023, during outside recreation, appellant was involved in a fistfight with six

other juveniles. Officers deployed O.C. spray after the juveniles failed to comply with directives. In September 2023, appellant refused to submit to a chemical test, and instead signed a form admitting to the use of fentanyl. In January 2024, during a painting activity, appellant displayed a gang sign with his hand when a picture was taken of him.

The supplemental report also summarized appellant's progress while in custody. Appellant received his high school diploma in November 2023 and began attending college classes online. He completed an anger management course, a course on substance abuse and violence, and participated in activities and therapy.

## C. *School records.*

The prosecution admitted school records for appellant detailing his behavior at two different schools from 2019 to 2022. On three occasions, appellant was reprimanded for aggressive conduct toward staff. This included a November 2021 incident during which appellant confronted an associate principal, swore at him, and said he was " 'not worried about hitting anybody.' " Witnesses to the incident stated it appeared appellant was going to strike the associate principal. Additionally, during a November 2022 incident, after a staff member counseled appellant about the need to complete his work, appellant was overheard stating he was going to " 'slap that bitch.' " The records also show numerous reprimands for other types of conduct, including making gang references, using marijuana, and failing to attend school.

## D. *Defense evidence.*

Defense counsel retained a forensic psychologist to conduct a psychological evaluation of appellant. In conducting her evaluation, she reviewed multiple records and reports and interviewed appellant. Her observations and opinions from her reports and testimony are summarized below.

Appellant was born and raised in Modesto, California. His mother has 10 children by four different men. He was raised by his mother and stepfather; he has never known

9.

his biological father. His stepfather is an active Norteño gang member with an extensive criminal record.

While growing up, appellant was exposed to domestic violence and drug use in the home. He reported he was placed in foster care for one year when he was nine or 10 years old due to his mother's drug use. Appellant has numerous prior referrals to child protective services for various reasons, including neglect and abuse. However, it is unclear from the records whether the referrals pertained to appellant or one of his siblings, and appellant denied being subjected to abuse.

The psychologist explained appellant has a history of exposure to multiple "Adverse Childhood Experiences." Such exposure can result in difficulty with impulse control, processing and regulating emotions, and "managing situations where sudden emotional arousal occurs." She diagnosed him with "Conduct Disorder" and "Cannabis Use Disorder."

The psychologist considered the five transfer criteria set forth in section 707, but she noted that the circumstances and gravity of the offense and delinquency history are not "typically an issue for psychological evaluation." Thus, her analysis focused primarily on the remaining three factors.

The psychologist concluded appellant does not exhibit criminal sophistication. With respect to the instant offense, she observed appellant's coparticipants were adults, it is unclear how much he was involved in any planning that occurred, the stabbing was carried out in a public area without efforts at concealment, and the offense appears to have been motivated by anger and a desire to retaliate. Although appellant has engaged in prior violent and aggressive conduct, he "is an affectively driven offender, with offenses being related to strong negative emotion and perceived disrespect."

As to the likelihood of rehabilitation, the psychologist opined appellant has the potential to benefit from treatment in a controlled setting where he is required to attend and participate in programming. Such treatment is available in the juvenile justice

10.

system and would involve intensive services to address appellant's substance abuse and childhood exposure to violence, drug use, and gangs. The psychologist concluded appellant appears to have the potential to "reverse his impulsive, affectively-driven behavior at the time of the crime," but noted "there is never any means of specifically predicting one's response to treatment."

Addressing prior attempts at rehabilitation, the psychologist stated that while past efforts to get appellant to comply with treatment were unsuccessful, the programs did not involve "assessment to explore his specific treatment needs" or "consequences for noncompliance." She contrasted this with appellant's performance since entering a custodial setting following his arrest for the instant offense. According to the psychologist, appellant has "done well in a structured setting, having completed high school and started college, behaving well (but for a few fights and a relapse into cannabis use), and engaging in programs afforded to him."

Based on the above, the psychologist concluded that appellant is "amenable to the services that would be provided to him within the juvenile court's jurisdiction, and there is no evidence of any disorder or condition that would suggest he is not amenable to said treatment."

### E.     *The juvenile court's ruling.*

At the conclusion of the hearing, the juvenile court granted the People's transfer motion, finding "by clear and convincing evidence" that each of the five transfer criteria set forth in section 707 weigh in favor of transfer. The court explained its reasoning as follows:

> "With regard to the degree of criminal sophistication, I agree with [the prosecutor] that there was some sort of planning involved in this, and essentially we assume that everything in the police report or report is true at this point in the proceedings, which is an anomaly but that's the way it is.

"I do find that factor one, there was a high degree of criminal sophistication involved, and that factor one militates in favor of the prosecution.

"With respect to number two, whether the minor can be rehabilitated before the expiration of the juvenile court jurisdiction -- and quite frankly, counsel, I think his performance since being a ward of the court since the age [of] fourteen has been dismal. I looked at his school records, which were admitted into evidence. Terrible. The incidents in [juvenile hall] continued. So I doubt that he could be rehabilitated before the expiration of the juvenile court's jurisdiction, which now is approximately six years away.

"Item three … the minor's previous delinquency record, again, has been dismal. He's been given multiple opportunities to cease his criminal behavior, and has failed to take advantage of them, so I find that factor three also favors the prosecution.

"Likewise, for the same reasons, factor four, the previous attempts by the juvenile court to rehabilitate the minor, have not been successful. Again, he's been offered services since the age of fourteen, and it culminates in this offense, so I find that factor four by clear and convincing evidence, militates in favor of transfer.

"And number five, nobody can dispute the gravity of the offense. It's as serious as it gets in criminal law. It's a murder of a young person. So the factor five, likewise, militates in favor of transfer. Therefore, the Court orders the matter transferred to adult court."

## DISCUSSION

### I. The Juvenile Court Did Not Abuse Its Discretion in Ordering Transfer of Jurisdiction to Criminal Court.

Appellant contends the juvenile court's findings as to each section 707 criteria were unsupported by substantial evidence. He also alleges the findings were based on misinterpretations of applicable law or made without giving appropriate weight to statutory factors. We address appellant's claims as to each criterion below.

#### A. *Applicable law and standard of review.*

"Section 707 sets forth the procedures for transferring a minor from juvenile court to criminal court. It provides that whenever a minor aged 16 years or older is alleged to

12.

have committed a felony, the prosecutor may move 'to transfer the minor from juvenile court to a court of criminal jurisdiction.' (§ 707, subd. (a)(1).)" (*In re Miguel R.* (2024) 100 Cal.App.5th 152, 164 (*Miguel R.*).)

"Upon receiving a transfer motion, the juvenile court is required to 'order the probation officer to submit a report on the behavioral patterns and social history of the minor.' (§ 707, subd. (a)(1).) In addition to the transfer report, the court may consider 'any other relevant evidence that the [prosecutor] or the minor may wish to submit.' (§ 707, subd. (a)(3).)" (*Kevin P. v. Superior Court* (2020) 57 Cal.App.5th 173, 186 (*Kevin P.*).)

The burden is on the People to establish "by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (§ 707, subd. (a)(3); see Cal. Rules of Court, rule 5.770(a); *In re E.P.* (2023) 89 Cal.App.5th 409, 416.) In determining whether transfer is warranted, the juvenile court must consider the five criteria set forth in section 707, subdivision (a)(3): (1) the "degree of criminal sophistication exhibited by the minor" (§ 707, subd. (a)(3)(A)(i)); (2) "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction" (§ 707, subd. (a)(3)(B)(i)); (3) the "minor's previous delinquent history" (§ 707, subd. (a)(3)(C)(i)); (4) "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor" (§ 707, subd. (a)(3)(D)(i)); and (5) the "circumstances and gravity of the offense alleged in the petition to have been committed by the minor" (§ 707, subd. (a)(3)(E)(i)). The weight given to each of the five criteria is within the court's discretion. (*C.S. v. Superior Court* (2018) 29 Cal.App.5th 1009, 1034–1035.) In addition, section 707 "sets forth a nonexhaustive list of relevant factors for the court to consider with respect to each of the five criteria. (§ 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).)" (*Miguel R., supra*, 100 Cal.App.5th at p. 164.)

We review a juvenile court's order transferring a minor to criminal court for abuse of discretion. (*Kevin P., supra*, 57 Cal.App.5th at p. 187.) "The court's factual findings

are reviewed for substantial evidence, and its legal conclusions are reviewed de novo. [Citation.]  A decision based on insufficient evidence or the court's ' "erroneous understanding of applicable law" ' is subject to reversal."  (*Ibid.*)

"Substantial evidence is evidence that is 'of ponderable legal significance,' 'reasonable in nature, credible, and of solid value,' and ' "substantial" proof of the essentials which the law requires in a particular case.' "  (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1006.)  Because transfer is subject to the clear and convincing evidence standard, we "must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof."  (*Id.* at p. 1005, fn. omitted.)

In reviewing for substantial evidence, we draw all reasonable inferences in support of the court's findings.  (*Miguel R., supra*, 100 Cal.App.5th at p. 165.)  We do not reweigh the evidence and "must accept the fact finder's resolution of conflicting evidence."  (*Conservatorship of O.B., supra,* 9 Cal.5th at p. 1008; see *In re J.S.* (2024) 105 Cal.App.5th 205, 208.)

## II. The Juvenile Court's Findings as to Each Criterion Were Supported by Substantial Evidence.  The Record Does Not Show the Court Misinterpreted or Misapplied Applicable Law.

### A. *"The degree of criminal sophistication exhibited by the minor."  (§ 707, subd. (a)(3)(A)(ii).)*

To assess criminal sophistication, the juvenile court "consider[s] the whole picture, that is, all the evidence that might bear on the minor's criminal sophistication, including any criminal sophistication manifested in the present crime."  (*People v. Superior Court (Jones)* (1998) 18 Cal.4th 667, 683–684.)  Because the question of guilt is not at issue at a transfer hearing, the court presumes "that the minor did, in fact, commit the offense."  (*Id.* at p. 682.)

We conclude substantial evidence supported the juvenile court's finding of criminal sophistication. Appellant participated in a vicious and calculated act of retribution. After Alejandro was purportedly assaulted by the victim and his brother, appellant and several others went to the victim's mother's apartment looking to confront them. While outside, appellant and other members of the group armed themselves with knives. When the victim returned to the apartment complex, appellant and his coparticipants immediately began chasing him, and ultimately stabbed him to death. As the court observed, this conduct indicates the stabbing was a planned attack, thus evincing a high degree of criminal sophistication. (See *People v. Superior Court (Jones), supra,* 18 Cal.4th at p. 684.) Moreover, after the stabbing, appellant successfully evaded law enforcement for over four months, even though he was a ward of the court and there was a warrant for his arrest. Such sustained efforts to avoid detection also show a high degree of criminal sophistication. (See *Kevin P., supra,* 57 Cal.app.5th at pp. 193–194,)

Appellant argues there is no evidence that he personally planned anything, suggesting the attack was orchestrated by his coparticipants, who were adults. But even assuming appellant was not involved in planning the attack, he was still intimately involved in the preparation and execution of the plan. He armed himself with a knife well in advance of the stabbing, then pursued the victim with his coparticipants knowing they were similarly armed. Once they caught the victim, they stabbed him 16 times, including in the chest and back, suggesting they acted with the intent to kill. These actions plainly demonstrate a high level of criminal sophistication, clearly supporting the juvenile court's finding.

Appellant also contends the juvenile court failed to consider certain factors set forth in section 707, subdivision (a)(3)(A)(ii),[8] such as his personal history and exposure

---

[8]     The subdivision states that "the juvenile court shall give weight to any relevant factor, including, but not limited to, the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense; the minor's

15.

to "Adverse Childhood Experiences," because the court did not address these factors in its statement of reasons. According to appellant, this court should assume the "juvenile court did *not* consider any factor it did *not* discuss." He relies on Senate Bill No. 545 (2023–2024 Reg. Sess.) (Stats. 2023, ch. 716, §§ 1–4), which recently amended section 707 to specify that the court "shall give weight to any relevant factor, including, but not limited to," those factors identified in the nonexhaustive list set forth under each criterion. (§ 707, subds. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).)" In appellant's view, this amended language, combined with the statutory requirement to provide a statement of reasons (§ 707, subd. (a)(3)), implies that when a juvenile court issues a ruling on a transfer motion, it must articulate every relevant factor it considered. Thus, appellant argues we must assume the juvenile court did not consider any of the above factors because it did not specifically address them in its statement of reasons.

We are not persuaded. Section 707, subdivision (a)(3) states the juvenile court must "recite the basis for its decision," including "the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." While section 707 requires the court to give weight to "any relevant factor," including those identified under each criterion, nothing in the statute obligates the court to exhaustively detail how it assessed every such factor in its statement of reasons. (§ 707, subds. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).)

In the absence of such a requirement, there is no legal basis to assume the juvenile court did not consider any factor it did not discuss. Instead, appellant's claim is subject to settled principles of appellate review. "[O]n appeal[,] a judgment is *presumed* correct, and a party attacking the judgment, or any part of it, must affirmatively demonstrate

impetuosity or failure to appreciate risks and consequences of criminal behavior; the effect of familial, adult, or peer pressure on the minor's actions; the effect of the minor's family and community environment; the existence of childhood trauma; the minor's involvement in the child welfare or foster care system; and the status of the minor as a victim of human trafficking, sexual abuse, or sexual battery." (§ 707, subd. (a)(3)(A)(ii).)

prejudicial error." (*People v. Garza* (2005) 35 Cal.4th 866, 881, italics added; see *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) "Absent evidence to the contrary, we presume that the trial court knew and applied the governing law." (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1390 (*Gutierrez*); see *People v. Myers* (1999) 69 Cal.App.4th 305, 310 ["The court is presumed to have considered all of the relevant factors."].)

Applying the above principles, we conclude appellant's claim the juvenile court did not consider all relevant factors is unsupported by the record. The court's ruling indicates it found the planning involved in the alleged murder was the most significant factor in its determination that appellant exhibited criminal sophistication. Although the court did not discuss the factors cited by appellant, such as his personal history, nothing in the record affirmatively demonstrates the court did not also consider these factors. Accordingly, appellant fails to establish the juvenile court did not give weight to all relevant factors in accordance with section 707, subdivision (a)(3)(A)(ii).

In sum, appellant's participation in a targeted, lethal assault amply supported the juvenile court's finding that appellant exhibited a high degree of criminal sophistication. Nothing in the record suggests this finding was based on an erroneous or incomplete application of appropriate legal standards. We therefore conclude the court's finding as to this criterion was supported by substantial evidence, and no abuse of discretion occurred.

**B.** ***"Whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction." (§ 707, subd. (a)(3)(B)(i).)***

Under this criterion, the juvenile court considers "whether there is enough time to rehabilitate the minor while the minor is still eligible to remain under juvenile court jurisdiction." (*Miguel R., supra,* 100 Cal.App.5th at p. 166.) "A juvenile court can retain jurisdiction over a minor … for the offense of murder until he or she attains 25 years of

17.

age ….'' (§§ 607, subd. (c), 1769, subd. (b).)" (*In re J.S., supra,* 105 Cal.App.5th at p. 213.)

In finding this criterion weighed against transfer, the juvenile court focused on appellant's conduct and rehabilitative history since becoming a ward of the court at age 14. The court accurately observed that at the time of the jurisdictional hearing, juvenile court jurisdiction would expire in approximately six years. Based on appellant's history of delinquency, failure to meaningfully participate in rehabilitative services, egregious behavior at school, and continued misconduct in juvenile hall, the court found it was unlikely appellant could be rehabilitated within that timeframe.

We conclude this finding was supported by substantial evidence. Prior to the date of the instant offense, appellant had been a ward of the court for almost four years. During that time, he was repeatedly referred to rehabilitative programs to address anger management, substance abuse, and other issues. In almost every instance, he was dropped from the program for lack of participation or nonattendance. He continued to reoffend, receiving probation violations for assault, resisting detention by officers, vandalizing the vehicle of a school principal, and possession of a stolen vehicle. His school records showed similarly egregious behavior, including threats to staff, making gang references, and using marijuana. Appellant's misconduct also continued while detained in juvenile hall. He was involved in two fights that required correctional staff to deploy OC spray, made a gang sign in a photo, and admitted to using fentanyl.

The probation officer concluded appellant is not "capable or willing to be rehabilitated as a juvenile." Considering the evidence presented at the transfer hearing, the trial court was entitled to reach the same conclusion. Over the course of four years, appellant made little to no effort to avail himself of rehabilitative services, and his misconduct continued to escalate, culminating in the instant offense. Given this history, the trial court had ample basis to find that future efforts to rehabilitate the minor as a juvenile would be similarly unsuccessful.

Appellant contends the juvenile court did not adequately consider appellant's performance while in custody pending the transfer hearing. He argues he responded well to long term detention and treatment in juvenile hall, noting he obtained his high school diploma, began taking college classes, and completed programs. However, as the court observed, appellant also engaged in several serious acts of misconduct. Despite any progress appellant may have made in his education and programing, his continued acts of violence, substance abuse, and apparent idealization of gangs provided the court sufficient basis to conclude appellant was not amenable to rehabilitation as a juvenile, even in a secure setting.

Next, appellant claims the juvenile court relied on the probation officer's erroneous assumption that his baseline commitment term would necessarily be set at seven years, and that this term establishes the minimum time necessary for rehabilitation. We agree the probation officer was mistaken. The baseline term is set by the juvenile court when it orders a minor committed to a secure youth treatment facility, and "represent[s] the time in custody necessary to meet the developmental and treatment needs of the ward and to prepare the ward for discharge." (§ 875, subd. (b)(1).) The baseline term must fall within the range set forth in California Rules of Court, rule 5.806, subdivision (d). For murder, the range is four to seven years. (§ 875, subd. (b)(1).) After the baseline term is set, the juvenile court may lower it at subsequent review hearings, depending on the minor's progress. (§ 875 subd. (e)(1)(A).) Thus, contrary to the probation officer's statements, appellant's baseline term would be set at a range of four to seven years if he remained under the jurisdiction of the juvenile court, and this term would not represent the minimum time necessary to rehabilitate him.

However, nothing in the record indicates the juvenile court relied on these erroneous assumptions. The court never mentioned the baseline term in its statement of reasons. Rather, the court only stated that based on appellant's history as a ward, it "doubt[ed] that [appellant] could be rehabilitated before the expiration of the juvenile

19.

court's jurisdiction, which now is approximately six years away." The court was not obligated to accept the probation officer's representations, and unless there is a contrary indication in the record, we presume the court was aware of and applied the applicable law. (See *Gutierrez, supra,* 58 Cal.4th at p. 1390.)

Appellant also claims the juvenile court placed undue weight on the fact that he could only remain under the jurisdiction of the juvenile court for six years. He contends the prosecution presented no evidence affirmatively demonstrating he could not be rehabilitated by existing programs in the juvenile system, and thus, there was no evidence that six years would be insufficient time.

Appellant relies primarily on *Kevin P.* There, the minor was alleged to have committed a brutal murder when he was 17 years old. (*Kevin P., supra,* 57 Cal.App.5th at pp. 178–182.) The minor had no delinquent history, and consequently, there had been no previous attempts to rehabilitate him under the juvenile system. (*Id.* at p. 184.) At a transfer hearing, the juvenile court found the likelihood of rehabilitation criterion weighed in favor of transfer because the circumstances of the offense indicated the minor had " 'a side to him that is extremely dangerous,' " and juvenile court jurisdiction would expire in six years. (*Id.* at p. 198.) The appellate court held this finding was not supported by substantial evidence, because the circumstances of the offense cannot be the sole basis for concluding a minor cannot be timely rehabilitated, and there was no evidence demonstrating appellant's rehabilitative needs could not be met by the juvenile court. (*Id.* at pp. 200–201.)

Appellant also relies on *J.N. v. Superior Court*, which involved similar facts. (*J.N. v. Superior Court* (2018) 23 Cal.App.5th 706.) As in *Kevin P.*, the minor was alleged to have committed murder at age 17. (*J.N., supra,* 23 Cal.App.5th at pp. 710–712.) He had minimal delinquent history and had not been referred to rehabilitative programs or counseling. (*Id.* at pp. 719–721.) At the time of the transfer hearing, the minor had three years remaining under the jurisdiction of the juvenile court. (*Id.* at p. 721.) Based solely

on this three-year limitation, the juvenile court found it was unlikely the minor could be timely rehabilitated. (*Ibid.*) The appellate court held this finding lacked evidentiary support, because there was "no evidence as to why available programs were unlikely to result in rehabilitation in the time allotted." (*Id.* at p. 722.)

We conclude the above cases are distinguishable. *Kevin P.* and *J.N.* both involved minors who were charged with very serious offenses but had little or no prior contact with the juvenile justice system. Because the minors had never received rehabilitative services, there was no history that could be used to assess their future amenability to such services. For this reason, the absence of evidence affirmatively showing why the minors could not be rehabilitated in the juvenile system was critical, because there was no other basis for the juvenile court to infer the minor could not be timely rehabilitated.

Here, conversely, there was ample history of delinquency and failed attempts to rehabilitate appellant from which the juvenile court could conclude that subsequent efforts were unlikely to be successful. Appellant had been a ward of the court since the age of 14, and despite years of efforts at his rehabilitation, his delinquent conduct continued and escalated. Even at age 18, when he was detained in juvenile hall on murder allegations, he continued to commit acts of violence and other misconduct. Given that appellant's five-year history as a ward showed an unwillingness or inability to reform, the court was entitled to find that six additional years under its jurisdiction was unlikely to result in his rehabilitation.

In reaching this conclusion, we recognize that appellant's psychological expert opined that he is amenable to rehabilitation under the juvenile system. But as appellant concedes, the court was not obligated to credit her opinion. (See *People v. Johnson* (1992) 3 Cal.4th 1183, 1231–1232.) While the court did not specifically address the psychologist's report or testimony in its statement of reasons, its ruling implies that it did not find her opinions persuasive in light of appellant's extensive history in the juvenile system and repeated failures to rehabilitate. Under the deferential substantial evidence

21.

standard of review, it is not proper for this court to second guess the court's assessment of the evidence.

Appellant also asserts the juvenile court failed to consider that under section 876, the prosecution may petition to extend juvenile court jurisdiction past the age of 25. But to obtain an extension under this provision, the prosecution must meet the high bar of proving beyond a reasonable doubt at trial that the subject is "physically dangerous to the public because of a mental or physical condition, disorder, or other problem that causes the person to have serious difficulty controlling their dangerous behavior." (§ 876, subds. (a), (e), (f).) While appellant has engaged in violent conduct, nothing in the record suggests he suffers from a condition or disorder that *causes* him to be dangerous. Thus, the court had no reason to believe juvenile court jurisdiction might be extended on this basis.

Finally, appellant claims the juvenile court did not give weight to his "potential to grow and mature," a factor listed under the instant criterion in section 707, subdivision (a)(3)(B)(ii). But as we explained above, the court was not obligated to articulate its consideration of each relevant factor. As nothing in the record affirmatively demonstrates the court did not assess appellant's "potential to grow and mature," appellant fails to show the court erred in this manner.

To conclude, appellant's extensive history as a ward of the court, continued and escalating delinquent conduct, and repeated failure to make any meaningful effort at rehabilitation gave the juvenile court a clear basis to find appellant cannot be rehabilitated before the expiration of juvenile court jurisdiction. Appellant's claims the court misunderstood or misapplied applicable legal standards are without merit. Accordingly, the court's finding this criterion weighed in favor of transfer was supported by substantial evidence, and no abuse of discretion occurred.

22.

**C.** *The minor's previous delinquent history.  (§ 707, subd. (a)(3)(C)(i).)*

The juvenile court described appellant's prior delinquency history as "dismal," and concluded the factor weighed in favor of transfer.  Substantial evidence supported this finding.  At the age of 14, appellant assaulted another student and inflicted head trauma, causing the student to be hospitalized.  Appellant was adjudged a ward of the court based on findings of assault with force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4)) and a great bodily injury enhancement (*id.*, at § 12022.7, subd. (a)).  Over the next several years, appellant engaged in conduct ranging from assault, resisting an officer, vandalism, and possession of a stolen vehicle.  While appellant argues this conduct did not result in new wardship allegations, the probation report indicates it formed the basis of two probation violations.  Thus, despite being offered a range of rehabilitative services, appellant continued to offend, culminating in the instant murder allegations.  This pattern of conduct supported the trial court's conclusion that appellant's delinquency history demonstrates he is not amenable to rehabilitation as a juvenile.

Appellant claims the trial court abused its discretion by failing to consider "what [his] history says about his amenability to rehabilitation."  (*In re S.S.* (2023) 89 Cal.App.5th (2023) 1277, 1289, 1292.)  Specifically, he contends the court did not give weight to "the effect of the minor's family and community environment and childhood trauma on the minor's previous delinquent behavior," which are factors listed under the instant criterion in section 707, subdivision (a)(3)(C)(ii).  However, as we have explained, the court was not obligated to discuss every relevant factor in its statement of reasons, and nothing in the record demonstrates the court did not consider these factors. (See *Gutierrez, supra,* 58 Cal.4th at p. 1390.)  Moreover, while appellant notes the psychologist opined that appellant's upbringing and exposure to "Adverse Childhood Experiences" likely contributed to his delinquent conduct, the court was not required to

credit her assertion that appellant is amenable to rehabilitation in the juvenile system despite his criminal history. (See *People v. Johnson, supra,* 3 Cal.4th at pp. 1231–1232.)

Ultimately, the record shows appellant has an extensive history of delinquent conduct, including a prior serious act of serious violence, and the juvenile court was entitled to find this outweighed any other relevant considerations. We therefore conclude the court's determination the instant criterion weighed in favor of transfer was supported by substantial evidence, and appellant fails to show the court misunderstood or misapplied the law.

### D. *"Success of previous attempts by the juvenile court to rehabilitate the minor." (§ 707, subd. (a)(3)(D)(i).)*

The juvenile court found this criterion weighed in favor of transfer based on the history of unsuccessful attempts to rehabilitate appellant since becoming a ward at age 14. Substantial evidence supported this finding. Appellant was repeatedly referred to numerous different rehabilitative programs and was consistently dropped for lack of participation or non-attendance. His delinquent conduct continued until he was arrested on the instant murder allegations. Once in juvenile hall, he committed additional acts of violence and other misconduct despite receiving additional rehabilitative services in a custodial setting.

Appellant does not dispute that prior attempts to rehabilitate him were unsuccessful, but he contends the record is insufficient because there was no evidence showing why such efforts failed. Observing that section 707, subdivision (a)(3)(D)(ii) directs the juvenile court to give weight to "the adequacy of the services previously provided to address the minor's needs," he argues the court incorrectly assumed prior failures at rehabilitation were solely attributable to him without due consideration of "the nature of these programs, or why they were an ill fit."

We are not persuaded that such additional evidence was necessary to support the juvenile court's finding. From ages 14 to 17, appellant was referred to an array of

24.

rehabilitative programs to address his needs, including anger management and substance abuse counseling. He failed to attend or participate, and his delinquent conduct continued. Regardless of whether these programs were an ideal "fit," appellant consistently showed no interest in making any meaningful effort at rehabilitation. From this extensive history, the court had ample reason to conclude that future efforts at rehabilitation would be similarly lacking.

Appellant also claims that his purported rehabilitative progress while in juvenile hall shows that he is amenable to rehabilitation in the juvenile system so long as he is in a "structured environment." While we recognize appellant successfully completed some programing in juvenile hall, his continued inability to refrain from acts of violence and other misconduct suggest these programs made no significant progress toward his rehabilitation.

Lastly, appellant repeats his contention that the juvenile court's statement of reasons indicates it failed to give weight to all relevant factors, including "the adequacy of the services previously provided to address the minors needs." (§ 707, subd. (a)(3)(D)(ii).) But nothing in the record affirmatively shows the court did not give weight to those factors. As we have explained, "[a]bsent evidence to the contrary, we presume that the trial court knew and applied the governing law." (*Gutierrez, supra,* 58 Cal.4th at p. 1390.) Accordingly, this claim is not supported by the record.

Appellant has been under the jurisdiction of the juvenile court since the age of 14, and despite years of rehabilitative programing, his delinquent conduct continued. Even after being arrested for murder and receiving services in juvenile hall, he continued to engage in violence and other misconduct. We therefore conclude the juvenile court's finding that the instant criterion weighed in favor of transfer was supported by substantial evidence, and no abuse of discretion occurred.

25.

**E.** ***"The circumstances and gravity of the offense alleged in the petition to have been committed by the minor." (§ 707, subd. (a)(3)(E)(i).)***

In evaluating this criterion, the juvenile may rely on evidence that "while not justifying or excusing the crime, tends to lessen its magnitude." (*Jones, supra*, 18 Cal.4th at p. 685, fn. omitted.) Section 707, subdivision (a)(3)(E)(ii) directs the court to consider "the actual behavior of the person, the mental state of the person, the person's degree of involvement in the crime, the level of harm actually caused by the person, and the person's mental and emotional development."

The juvenile court found this criterion weighed in favor of transfer because the alleged offense involved the "murder of a young person," and is "as serious as it gets in criminal law." Appellant contends this finding was not supported by substantial evidence, asserting the prosecution did not establish his actual level of involvement in the murder or his mental state. Thus, he claims the circumstances and gravity of the offense demonstrate little about his amenability to rehabilitation.

We disagree. The evidence showed appellant, and several others, went to the victim's mother's apartment to confront the victim and his brother. As they waited outside, appellant and others armed themselves with knives. When the victim arrived, appellant and his coparticipants pursued him through the apartment complex and stabbed him 16 times, including in the chest and back. While it is unclear how many times appellant personally stabbed the victim, there is no dispute that appellant was one of the three assailants, and the victim died from the wounds they inflicted. Considering the apparent planning and preparation that preceded the murder, and the number and location of the stab wounds, the evidence indicates appellant acted with the intent to kill, and that his conduct was willful, deliberate, and premeditated. The evidence therefore demonstrates appellant was directly and intimately involved in the targeted murder of the victim, clearly supporting the juvenile court's finding this criterion weighed in favor of transfer.

Appellant also repeats his claim the juvenile court's statement of reasons reveals it failed to consider all relevant factors, including those specified in section 707, subdivision (a)(3)(E)(ii). But as before, nothing in the record affirmatively shows the court did not consider these factors, and thus, we presume the court knew and applied governing law. (See *Gutierrez, supra,* 58 Cal.4th at p. 1390.) Appellant therefore fails to establish error on this basis, and this claim is without merit.

**III. Substantial Evidence Supported the Juvenile Court's Ultimate Finding that Appellant "Is Not Amenable to Rehabilitation While Under the Jurisdiction of the Juvenile Court." An Abuse of Discretion Did Not Occur. (§ 707, subd. (a)(3).)**

The juvenile court found by clear and convincing evidence that each of the five section 707 criteria weighed in favor of transfer, and we have concluded those findings were supported by substantial evidence and based on applicable law. Accordingly, we reject appellant's claim that the court's implied finding by clear and convincing evidence that appellant is not amenable to rehabilitation under the jurisdiction of the juvenile court was not supported by substantial evidence. Likewise, because we have rejected appellant's claims as to each criterion that the court misunderstood the law or failed to give weight to all relevant factors, we conclude the court did not abuse its discretion in ordering transfer.

**IV. The Juvenile Court's Statement of Reasons Did Not Deprive Appellant of Meaningful Appellate Review.**

In addition to challenging the basis for the juvenile court's transfer order, appellant contends the court's failure to articulate its assessment of all relevant factors in its statement of reasons denied him of his due process right to meaningful appellate review. But as we have repeatedly explained, the court was not statutorily obligated to exhaustively detail its consideration of all relevant factors. Rather, the court was only required to "recite the basis for its decision," including "the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the

jurisdiction of the juvenile court." (§ 707, subd. (a)(3).) Such a statement of reasons affords meaningful appellate review if the court "clearly and explicitly 'articulate[s] its evaluative process' by detailing 'how it weighed the evidence' and by 'identify[ing] the specific facts which persuaded the court' to reach its decision." (*C.S. v. Superior Court, supra,* 29 Cal.App.5th at p. 1029, quoting *In re Pipinos* (1982) 33 Cal.3d 189, 198.)

Here, the juvenile court made express findings as to each of the five section 707 criteria, described how its assessment of certain relevant factors compelled those findings, and pointed to specific facts in the record it found significant. Thus, the statement of reasons was sufficient for this court to ensure the juvenile court "properly exercised its discretion." (*In re Pipinos, supra,* 33 Cal.3d at pp. 198, 203.) We therefore conclude appellant was not denied meaningful appellate review, and we reject this claim.

## DISPOSITION

The juvenile court's order transferring appellant to a court of criminal jurisdiction is affirmed.


LEVY, Acting P. J.

WE CONCUR:


DETJEN, J.


FAIN, J.[†]

---

[†]     Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.